CASE 14—PETITION ORDINARY—FEBRUARY 23.

# Hill v. Thixton, &c.

APPEAL FROM DAVIESS CIRCUIT COURT.

1. FRAUD—CERTIFICATE OF OBLIGOR THAT THERE IS NO DEFENSE TO NOTE.—Where the obligor in a note accompanies it with a certificate that it is a *bona fide* debt against him, that "there is no offset, discount or counter-claim or defense against the same," and that it will be paid at maturity, he is not estopped, even as against one who has purchased the note upon the faith of the certificate, to impeach the note for fraud, provided he alleges and proves that the certificate was also obtained by fraud.

2. TRANSFER OF PEDDLER'S LICENSE—The withdrawal of one member of a firm to which a peddler's license has been issued, does not deprive the remaining members of the firm of the right to do business under the license. This is not such a transfer of the license as the statute denounces.

J. A. DEAN FOR APPELLANT.

As the payees of the note sued on were peddlers, and had not taken out license as required by law, there can be no recovery on the note. (Rash v. Holloway, 82 Ky., 674; Rash v. Farley, 12 Ky. Law Rep., 913.)

Hill v. Thixton, &c.

WEIR, WEIR & WALKER FOR APPELLEES.

If the plaintiffs in the purchase of the note relied upon the statements
in the certificates, they operate to estop the defendant from rely-
ing upon the defense of want of consideration and fraud in pro-
curing the note. (Crabtree v. Atchison, 13 Ky. Law Rep., 321;
Wells v. Lewis, 4 Met., 270; Rudd v. Matthews, 79 Ky., 486.)

C. S. WALKER ON SAME SIDE IN PETITION FOR REHEARING.

Cited: Jaqua v. Montgomery (33 Ind., 36), 5 Am. Rep., 168; Dickerson
v. Colgrove, 100 U. S., 578; Kellogg v. Curtis (69 Me., 212), 31 Am.
Rep., 274; Swift v. Smith, 102 U. S., 442; Crumwell v. Sac County,
96 U. S., 63; Goodman v. Simonds, 61 U. S., 343; Greenwood v.
Hayden, 78 Ky., 333.)

JUDGE HAZELRIGG DELIVERED THE OPINION OF THE COURT.

In the summer of 1888 Hill, the appellant, who was
a timid and unlettered man, was visited by a stranger,
who induced his assistance toward starting his light-
ning-rod enterprise in the neighborhood by obtaining
a promise to let him rod his house, assuring him that
it would cost him only four dollars. In a few days
some four other strangers appeared, and proceeded
to decorate his humble shanty with the most im-
proved lightning conductors "known to science."
After completing the job they asked him to sign some
papers which they called "recommendations," pur-
porting to prove to the neighbors the good character
of the work. He signed his name to two of these
papers. He could not read writing, and could scarcely
write his name. They then presented him a note to
sign for one hundred and seven dollars and ten cents,
due in six months. He refused to do so. They be-
came mad, and told him he had to sign it. Angry
words passed, threats were made, and finally appel-
lant called on his mother for help. The talk was

continued, the men declaring that he must sign the note. They threatened to sell his home in the United States Court. To stop the excitement among the men and prevent a difficulty, he finally signed it.

Coleman, a witness, who was present and working for the strangers, and who had come there with them, testifies that he was employed by the lightning-rod men; that "Hill refused to sign the note; Mr. Medanich told him he must sign the note; that they employed lawyers by the year, and that a number of suits did not cost them any more than one suit; that they did not sue in these little courts here, but they did all their business in the United States Court. Mr. Hill still refused to sign the note, and pretty hot words followed. Mr. Hill seemed to be a very timid man, and they scared him into signing the note by threatening him. These men were very vicious, bulldozing kind of men, and were very dangerous men; that from conversations with the men, he learned that the cost of the rod put up for Hill was about seven dollars, and that the profits were about one hundred dollars on the job."

In June, 1889, the appellees, Thixton and Atchison, claiming to be the owners and holders of the note, sued Hill, the appellee, thereon, in the Daveiss Circuit Court. He answered that the note was not his act and deed—that the words "negotiable and payable at the bank of Owensboro, Ky.," had been inserted therein after he had put his name to it, and without his knowledge or consent. That it had been procured, in its original form, by fraud, oppression and intimidation, and he had executed it to save himself

from personal violence, and to avoid bodily harm with which he was threatened.    He also alleged that the plaintiffs' assignors were peddlers, and had no license as provided by law.    Upon the state of case thus presented, we presume that no court would sanction the enforcement of the contract and collection of the note sued on.    As a matter of fact, on the trial there was no contrariety of testimony, the foregoing facts being established by Hill, the appellee, and Coleman, the employe of the payees of the note, and while denied in the reply, were not contradicted by proof.

But in their reply the appellees rely on the following writings, signed and delivered, as they allege, on the day the note was executed, as an estoppel against any defense to note sued on, and as precluding a court of justice from relieving this timid and ignorant countryman from this bold robbery.    The writings are as follows:

"RECOMMENDATION.

"To All Whom it May Concern:

"This is to certify that J. Medanich & Co., agents of the Franklin Lightning Rod Co., has erected their copper covered lightning conductor on my residence, and has done me good work and given satisfaction in every respect.

"I take pleasure in recommending them to all in need of rods.    July 7th, 1888.

(Signed)                         "W. H. HILL."

"To All Whom it May Concern:

"This is to certify that a note executed by me to J. Medanich & Co., for one hundred and seven dollars and ten cents, due in six months, is a *bona fide*

debt against me, and there is no offset, discount or counter-claim or defense against the same ; and the same is good against me for the full amount thereof, and will be paid at maturity to said J. Medanich & Co., or to such persons as they may assign said note to.

"Given under my hand this, the 7th day of July, 1888.            (Signed)            W. H. HILL."

Appellees also attempted to avoid the alleged want of license by filing one granted regularly to Medanich, Shay & Co. (the Co. being Freeman), alleging that Shay had retired from the firm, and that the business was being conducted by Medanich and Freeman, the surving members ; and this, we think, was a valid license, and not such a transfer as the statute denounces.    The appellees alleged that the certificate of recommendation showed on its face that the work had been done by the Franklin Lightning-rod Company, which produced no license, and that the plaintiffs' assignors were only agents.    The second certificate was lost, and he alleges want of knowledge or information as to signing it, and that if he did so, it was procured by fraud, overreaching and deceit, and with intent to estop him in his defense, of which facts the plaintiffs had notice before they bought the note, and knew also that the transaction and circumstances under which the note originated were suspicious, and sufficient to have put them on inquiry.

The trial court properly instructed the jury on the subject of the alteration of the note after its execution and delivery, and as to its procuration by fraud, threats, &c., but expressly modified these instructions

by telling the jury to find for the plaintiffs, even if they believed the note to have been materially altered, or had been obtained by fraud, threats, &c., provided they further believed that the plaintiffs bought and became the owners of the note in good faith, relying on the statements contained in . the two certificates named above, and provided the defendant had signed the papers.   Thus is presented for our consideration the real question in this case, and that is, what effect is to be given the certificate agreeing not to set up any defense ?

The court below assumed that the note itself, containing an absolute promise on its face to pay the sum named at its maturity, and importing absolute verity, might be impeached for fraud in its procurement, and. yet the certificates, executed at the same time, importing nothing more than is certainly and definitely implied in the note, could not be so impeached. .

If the maker may have been overreached in the execution of the one, why may he not have been in the execution of the other? And if he can impeach one, why may .he not the other?   The case of Crabtree v. Atchison, 93 Ky., 338, is relied on by appellees.   In that case it is said that "the writing delivered to the payees of the note, and exhibited to the appellees by the payees to induce them to purchase it, and upon the assurances of which they relied in making the purchase, was equivalent to personal assurances made to the appellees by the appellant face to face, to induce them to make the purchase, and upon which they relied in making the

purchase." That is, that the assurance that he had no defense was a continuing, ever present and existing truth, asserted "face to face" to "whomsoever it might concern," and as such must estop the appellee from denying the truth of such assurance. But was not the absolute promise of the appellee contained in the other writing executed at the same time (the note), agreeing to pay the sum of one hundred and seven dollars and ten cents in six months after date, at the Bank of Commerce of Owensboro, Ky., a continuing and existing promise, and which the payees were at liberty to exhibit to the appellees and the world as an inducement to buy the paper?

And why shall the one be said to have the force of a "face to face" assurance, that "the same is good against me for the full amount thereof, and will be paid at maturity," any more than the other is a "face to face" assurance that "I will pay the sum of one hundred and seven dollars and ten cents," which was the full amount of the note, "in six months," which was at its maturity?

In the case of Crabtree v. Atchison, *supra*, the answer was not deemed sufficiently explicit to raise the question of fraud in the procurement of the certificate, and the case was reversed on other grounds. The principle announced followed the case of Wells, &c., v. Lewis, &c., 4 Met., 269, and no fraud was properly alleged by the defendant as to the obtention of the certificate.

We are clear that there is no difference in principle between the assurance given in the note and that given in the certificate. And yet we know that a

subsequent "face to face" assurance, given by the maker of a note that he would pay the amount of it at its maturity, is an estoppel against his assertion of any defense thereto. We conclude, therefore, that as the promise in the note can not be given the force of a personal and continual assurance, so can not that effect be given the other and accompanying paper.

They are in effect a single transaction, and are to be considered as if embodied in but a single paper; executed and delivered together, they stand or fall together. What may be used to impeach the one may be used to impeach the other.

There is not an idea or thought expressed in the one paper which is not expressed in the other. In the certificate we have that which is but the extended meaning of the note—"*bona fide* debt against me." Certainly the note distinctly imports as much. "No offset, discount or counter-claim or defense;" of course not, says the note by clear implication. "The same is good against me and will be paid at maturity." Surely these assurances are, even in express terms, embraced in the note.

The case of Wells, &c., v. Lewis, &c., 4 Met., 269, cited against this view, was where neither the note nor the accompanying paper was attacked for fraud. The consideration alone of the note was sought to be impeached, and its makers having voluntarily given the certificate that they had no offset in order to give currency to their paper, would have been guilty of perpetrating a fraud on the innocent holder if defense had been allowed. If the note and its accompanying "letter of credit" were executed voluntarily, and free

from imposition and fraud, then recovery should be had; if the note or its "certificate of good character" were not so obtained, then whatever defense, discount or offset might have been used against the original obligee may be used against the assignee.

Such is the purport of the statute regulating the assignment of such paper. Moreover, we are by no means certain that the appellees were free from notice sufficient to have put them on inquiry. They had been told by a party from whom they were seeking information as to his solvency that Hill was poor; that his brother was putting up the money with which to buy the little farm; that he was too good a man to be imposed on by lightning-rod men, and that there was certainly something wrong about the note. Upon presentation of the note alone of the appellant, importing as it did a valid consideration, and containing an express promise to pay in the usual form, a purchase would have been more in accordance with the usual course of trade than when the holder shows evidence of the necessity of fortifying his property by a suspicious overshow of virtue. It was a statement on which they had but slim right to rely. It was indeed calculated to arouse and excite suspicion. An ordinary and unsuspicious-looking promissory note was in bad company when it had to be backed up by such an unusual paper. The majority opinion of the court in Jaqua v. Montgomery, 33 Ind., 36, sustains this view. In that case Gregory, C. J., who delivered one of the opinions, in speaking of such an accompanying paper, says "it looks too much like the act of the thief in attempting to cover up his crime."

The judgment below is reversed, with directions to allow the case to proceed according to the principles of this opinion. Chief Justice Bennett dissenting.

---

Chief Justice BENNETT delivered the following dissenting opinion:

The appellees, as the assignees of J. Medanich & Co., sued the appellant on a note for one hundred and seven dollars. To the plea of no consideration, fraud and duress, the appellees replied that they were purchasers of the note for value, and without notice of the matters alleged, and were induced to make the purchase by the representation of the appellant contained in a writing signed by him and delivered to Medanich & Co., to be used by them in inducing the sale of the note, and which induced the appellees to purchase it. Said writing represents the debt as being *bona fide* against the appellant, that "there is no offset, discount or counter-claim or defense against the same; that the same is good against me for the full amount thereof, and will be paid at maturity to said J. Medanich & Co., or to such persons as they may assign said note to." The appellees relied upon said representations as an estoppel to the defenses indicated, which the lower court sustained and which the Superior Court affirmed. It will be seen that the opinion of the majority of the court reverses the lower court and the Superior Court, upon the ground that the estoppel pleaded was not available if J. Medanich & Co. had defrauded the appellant in obtaining the note and writing. That this is the meaning of

the opinion, there can be no doubt. In order for the
court to reach its conclusion, it found itself com-
pelled, although disclaiming it verbally, to ignore
and overrule the cardinal feature of the law of es-
toppel, as expressed by its own reported decision,
to wit : If a person, by his false speech or conduct,
induce another person to act differently from what
he would have otherwise acted, such person can not
thereafter deny the truth of his speech or conduct,
and show the real truth of the matter, because such
showing would be a deception and fraud, practiced
upon an innocent person. Such person is estopped
to deny the truth of his speech or conduct, although
he may have been deceived and defrauded into such
speech or conduct by other persons, provided the per-
son thus influenced was innocent and ignorant of the
fraud of such other persons. So, also, if such per-
son authorizes a person to make certain assurances to
another person that certain things are true, and which
assurances such person does, in good faith, act on
as true, it is equally well settled that the person au-
thorizing the assurances can not deny their truth ;
for to allow him to do so would be a fraud upon the
person thus acting upon them. In such case the per-
son authorizing the assurances would not, as against
the person acting upon them, be allowed to show
that the person whom he authorized to make them in
his behalf, had obtained the authority by defrauding
him ; because the person who acted on the assurance
would be, nevertheless, defrauded by the person giving
the authority. It seems to be perfectly settled that
if two persons are defrauded, and loss must fall upon

Hill v. Thixton, &c.

one or the other, that one that acts in bringing the fraud about must suffer the consequences—the loss must fall on him. He, in equity, is the wrong-doer. He has intrusted the authority to another to say to still another or others, that he would do so and so in order to induce them to act, and if such other rely upon that information as true, and act upon it, but it turns out that the person giving the authority was defrauded by the person to whom it was given, he must bear the loss, for to allow the person giving the authority to repudiate the act, because the person to whom he gave it defrauded him, would be to allow him to defraud the person who acted in good faith upon the authority given. Therefore, which one of these innocent persons should bear the burden of the fraud? I say it is perfectly well settled that the person giving the authority must bear the burden, because but for him the person acting on the authority would not have been defrauded, and he must bear the loss as far as such person is concerned, and look alone to the person that wronged him for redress. It may be that his hope from that source is non-availing; but that fact does not justify him in perpetrating a wrong upon such person whom he has induced to act upon a falsehood and worst his condition. I say that in a case like this, it is the fraud practiced by the person upon another that estops him from denying the truth of his assertion, upon the truth of which the other person has been induced to act and change his condition.

The opinion holds that the note and paper giving the assurance that Hill had no offset or defense to

the note, and it would be paid to the assignee, were simultaneously executed, and must be regarded as one and the same transaction.  And as the promise contained in the note implied as much as said writing expressed, and as the payor was not cut off from his defense of fraud, etc., in the obtention of the note in the hands of the assignee; so, likewise, he might make the same defense to the simultaneous writing —both being but one transaction and subject to the same defenses in the hands of the assignee.

This view of the case certainly, in effect, overrules the case of Crabtree v. Atchison, 93 Ky., 338; for the same written assurance was relied on in that case as in this case, and the pleas of no consideration and fraud made, and the plea of estoppel made to said pleas as in this case.  And this court, all of the judges concurring, decided that the assurances given in said writing, and which induced the assignee to make the purchase, estopped Crabtree from asserting the truth, by showing no consideration and fraud.  Say what you please, but I have given the plain, practical meaning of the decision, which is in effect overruled.  But the court seems unable to see the difference between the note's promise and the promise contained in the agreement.  But let us see if there is not a wide and valid difference.  A promissory note by chapter 22, section 6, General Statutes, is subject to all defenses in the hands of an assignee that might be used against the payee; therefore, the promise to pay contained in the note is made subject to defenses, &c.  But it is undoubtedly the law that the payor may agree and bind himself for a valuable consideration to make no defense as against the payee.

And also, he may, without the valuable consideration, estop himself from making defenses as against an assignee of the note. Why? Because if he gives assurance to the assignee that the note is not subject to defense, and the assignee is induced to buy it upon the faith of that assurance, the maker would commit a fraud upon him, if allowed to deny the truth of the assurance; therefore, to prevent the fraud he is estopped to deny it. But the opinion says if it is a simultaneous agreement, it becomes a part of the note and the rule does not apply. Well, suppose the agreement was contained in the note itself, and the assignee should be induced to purchase it upon the faith of the assurance, would not the maker be estopped to deny it? Why not? The assurance is an agreement, not an essential part of a simple promissory note, but an addition to it. The simple promise by the note to pay is made subject to all defenses in the hands of the assignee that could be made against the payee. And the agreement, although contained in the note, is an addition or collateral to the simple promise and estops the payor from setting up defenses as against the assignee, because of the fraud that he would practice upon him by so doing.

Now as to the simultaneous agreement not effecting an estoppel, it seems that this court is fully committed the other way. In the case of Barbaroux v. Barker, 4 Met., 47, the appellant and Holbrooke executed to each other their respective promissory notes for preceding indebtedness, agreeing that each might use the note executed to him for the purpose of raising money. Barbaroux, at the time he executed his note, gave to Holbrooke a writing, saying:

"You may use my notes anywhere you can," except, &c. To a suit by Holbrooke's assignee on the note executed by Barbaroux, the latter pleaded Holbrooke's note as an offset, but the court held that Barbaroux was estopped from pleading the offset against the assignee, because to allow it would be a "fraud" upon him. In the case of Smith v. Stone, 17 B. M., 170, the assignee's agent asked the maker of the note, before the assignment, if the note was all right, and he replied that it was, and would be paid at maturity, and upon the faith of which the note was purchased. It was held that the maker was estopped from making defense to the note in the hands of the assignee, because it would be a fraud upon him. Now the two cases in 4 Met.—one referred to in the opinion—show that the agreements that estopped the makers of the instruments were made simultaneously with the promises, and that the court held such simultaneous agreements to work an estoppel in favor of the assignee. And without fatiguing the reader with any more citations, I can assure him that there are many more authorities, including this court, to the same effect. But it is said that inasmuch as the simultaneous writing was obtained by fraud, Mr. Hill is not estopped from defending, although innocent parties were induced by the assurances to buy the note. But it seems to me that this view destroys, in a great measure, the doctrine of estoppel; the controlling and essential feature of which is to prevent fraud by estopping a person whose assurances have been given to induce others to act, and but for which they would not have thus acted, from denying the truth of the assurances.

To allow the person giving the assurances to say he was mistaken, or he was defrauded into making them by a third person, would defeat the very object that equity has in view in estopping him, and strip the doctrine of its beauty; for there is nothing more repulsive to honest and fair dealing than to allow a person to say, "It is true I, in order to induce you to buy this note at its fair value, agreed with you that it would be subject to no defense in your hands, and it would be promptly paid to you, and, thus induced, you did buy it at its fair value, and without notice of any infirmity; but as the person to whom I gave the assurance, in order for him to give it to you, obtained the assurance by fraud, I am therefore authorized to defraud you." But, says the other person, it is well settled that if a loss is to fall upon either of us by reason of the fraud of that other person, it should fall upon you, because you authorized him to give me your assurance, which he did, and by which I was influenced to make the purchase, and I did not know, and had no reason to believe, that he obtained the assurance from you by fraud; but you nevertheless gave out the assurance, and caused the fraud to be practiced upon me; so you should therefore bear the loss, and not me, who is entirely innocent. Oh! oh! says the other, you forget that the written assurance that I sent you by that person was made simultaneously with said note; therefore, I am not estopped to deny it even as against you—an innocent purchaser deceived and defrauded by the assurances given out by me that it was obtained from me by fraud; but if I had sent it out

just an hour or two afterwards as an independent agreement, you would have had me bound hard and fast, but as it is I have got you, old boy; the loss must fall upon you, and I go scot free.

It is true, I recognise the equity of the rule that if I give out assurances intending you to act on them as true, and you do act upon them as true, I can not thereafter say, so far as you are concerned, they were untrue, if my saying so would affect your rights, acquired upon the faith of those assurances, although the assurances were obtained from me by the fraud of the person that gave them to you for me, because it would be a fraud upon you for me to do so. And, although I was defrauded by such person into giving the assurances upon which you acted, I should bear the loss instead of you, because the loss should fall upon the one that caused it, and as I, so far as you are concerned, caused it, I should bear the loss and not you; but the court has, luckily for me, but wholly unexpected by me, come to my relief, because I happened to execute a note about the same time that I executed the assurance upon which you acted, which was obtained from me by the fraud of another person, and which fraud releases me and shifts the loss upon you, who had nothing whatever to do with the fraud upon me, but was an innocent party all the way through. Natural justice requires that I should bear the loss instead of you, because I sent those assurances to you independently of the simple promise in the note as an additional inducement to you to buy the note. But law is law, and thus it is recently written, and we are all bound thereby. But here are the Metcalfe cases, the Ben Monroe cases,

Hill v. Thixton, &c.

and others, and lastly, the Crabtree case, that say the fact that the agreement was made simultaneously with the note makes no difference; that the agreement is not merely a simple promise to pay and subject to all defenses; but it is a substantive agreement that binds the party, and he is estopped to deny it, if the denial affects the rights of the person acquired upon the faith of the agreement. Yes, yes, that is all true; but you had just as well take leave of the late lamented Crabtree, who, in October, 1892, was required to pay out his hard dollars because he was estopped from denying the truth of this same agreement, because the denial would defraud you. But in February, 1893, there was new light turned on by Indiana, and I am released from the very same obligation, because the fraud I perpetrated upon you does not estop me from showing that that sweet-scented geranium that I sent to you as the bearer of my assurances, and upon which you acted in good faith, acted the rascal with me, and in order to get even with him I am privileged, under the sporadic decision of Indiana, to act the rascal with you, and mulct you for acting upon the truth of the assurances. You should have known better, you idiot; and for your folly you must bear the loss, not me. I should have known better! How could I have known better? Instinct, Instinct! Hal, is a great thing. You should have known better "on instinct." But there is another precedent in favor of the Indiana opinion that I came near forgetting. I allude to the celebrated speech of Old Man Sixty before Judge Cissell, of Henderson, Kentucky. He said: "Everybody cheats me and I cheats everybody, and

everybody dat I cheats must submit, because everybody cheats me; dat is equity for you, sir."

But it is stated in the opinion that the Crabtree opinion was reversed on "other grounds." Well, it was reversed upon the one ground of error in the lower court as to the order of argument, but is as true as truth itself that it was in all other respects affirmed, because the simultaneous writing having induced others to act, Mr. Crabtree would have committed a fraud upon them had he been allowed to deny the truth of the writing.